UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISRAEL ACKERMAN,<br><br>                              Petitioner,<br><br>v.<br><br>ROSEMARY NDOH and XAVIER BECERRA,<br><br>                              Respondents. | Case No.:  20cv1091-LAB(BLM)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Court Judge Larry A. Burns pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On August 10, 2020, Petitioner Israel Ackerman ("Petitioner" or "Ackerman"), a state prisoner who is proceeding *pro se* and *in forma pauperis*, filed an Amended Petition for Writ of Habeas Corpus[1] pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court convictions for attempted voluntary manslaughter and assault with a deadly weapon.  ECF No. 4 ("Pet.").  The Court has reviewed the Amended Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer [ECF No. 7-1 ("Answer")], the Traverse [ECF No. 9 ("Traverse")], the lodgments [ECF

---

[1] Judge Burns dismissed Petitioner's initial petition on July 14, 2020 for failure to sign the petition and ordered Petitioner to file an amended petition by no later than September 14, 2020.  ECF No. 3.

No. 8], and all the supporting documents submitted by both parties. For the reasons discussed below, the Court **RECOMMENDS** the Petition be **DENIED**.

## I. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); see also Rice v. Collins, 546 U.S. 333, 338-39 (2006) (holding state court factual findings are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

*The People's Case*

Anthony K.'s family owns a liquor store and two apartments above the store. Stairs from the parking lot lead to the apartments.

In April 2017 Anthony was renovating the vacant apartments. His friend, Bianca, came by to see him. At the same time, Ackerman parked in front of the liquor store. Bianca and Ackerman knew each other. They spoke briefly in the parking lot. Ackerman told Bianca he was having domestic problems. After they exchanged phone numbers, Bianca went upstairs to the apartment and Ackerman drove away.

About 30 minutes later, Ackerman returned. Anthony, who did not know Ackerman, told Bianca, "I think your friend is here."

Bianca was surprised that Ackerman returned. She did not know why he came back, had not asked him to return, and specifically denied that he returned to buy drugs from her. Anthony thought that Ackerman returned because Bianca "is a pretty girl." Hoping that Ackerman would just leave, Anthony told Bianca to remain in the apartment.

Ackerman tried to get Bianca's attention by honking his truck's horn and whistling. When that did not work, he called Bianca's phone. When she did not answer he texted, "What the fuck, I'm waiting outside."

When Bianca did not come downstairs, Ackerman went upstairs. When Anthony told him to leave, the men argued. Their yelling was so loud and angry, a neighbor recorded it because she feared "something was going to happen." The audio recording was played for the jury. Ackerman left the parking lot yelling, "I know where you live. I'll be back."

Bianca felt badly that the men had argued and knew Ackerman was having

family problems. She texted him, "I'm sorry, I'm so fucking sorry."

Fearing that Ackerman would return, Anthony watched the stairway while continuing to work in the apartment. About 20 minutes later, Ackerman returned. But this time, he did not come up the stairs. Instead, he used a ladder to climb up onto the second floor patio. Ackerman barged through the apartment's door holding a knife. Making stabbing motions at Anthony, Ackerman said, "What's up now, motherfucker."

Ackerman ran into the apartment so fast, Bianca could barely get out of the way. Anthony was shocked to see Ackerman because he was watching the stairwell and did not see him come up the stairs.

Anthony grabbed a long-handled paint scraper and hit Ackerman. Ackerman stabbed Anthony four times in the arm and leg. Ackerman, who outweighs Anthony by 30 pounds, pushed him against a window. Bianca was screaming, "Stop, stop it."

Anthony fell on glass and blacked out. When he regained consciousness, he saw that Ackerman was also unconscious. While Ackerman was out cold, Anthony punched him in the face and pepper sprayed his eyes "in case he waked up [sic] so he can't come after anybody . . . ."[2]

Anthony was bleeding profusely; Bianca thought he was going to die. Anthony picked up the knife and tried to give it to Bianca. But she refused to hold it, so Anthony left the knife in the stairwell.

Anthony and Bianca walked across the street to a fire station, where paramedics attended him and called an ambulance. One stab wound near the femoral artery could have caused a life-threatening loss of blood had it been struck.

Police arrested Ackerman inside the apartment. Ackerman had a fractured nose and multiple facial fractures.

Police recovered a bloody knife with a four-inch dual blade at the top of the stairs. The blade had a paint-like substance on it. Police were unable to recover any fingerprints from the knife. However, DNA analysis showed that Anthony's blood alone was on the blade and the bloody parts of the handle. On an area of the handle with no apparent blood, 98 percent of the DNA was Anthony's and two percent was Ackerman's. The police criminalist explained that faint amounts of blood invisible to the naked eye probably accounted for the prevalence of

---

[2] Anthony had the pepper spray in his pocket, but Ackerman came at him so fast, he did not have time to use it earlier.

Anthony's DNA on the seemingly bloodless part of the handle.

*Defense Case*

Alicia, Ackerman's girlfriend, accompanied him to the liquor store. She was seven months pregnant and waited in the truck. She testified that Ackerman was not angry and never mentioned planning to assault or try to kill anyone.[3]

A defense-retained criminalist supported Ackerman's theory that the knife belonged to Anthony. He testified that the knife's owner should be the predominant source of DNA on the bloodless part of the handle. Moreover, the person who owned the knife "and used it over and over" should be the dominant DNA profile. The defense expert disagreed with the police criminalist's opinion that faint amounts of blood accounted for Anthony's DNA on the apparently bloodless part of the knife handle. He explained that the test the police criminalist used on the handle that indicated there was no blood there is highly accurate. He also testified that if Anthony merely picked up the knife and then dropped it, one would not expect his DNA to overwhelm at 98 percent. The defense expert stated there was insufficient data to conclude that the two percent DNA on the knife handle was Ackerman's.

Ackerman did not testify. A physician who treated him at the hospital testified that Ackerman tested positive for methamphetamine and alcohol.

*Closing Arguments*

The prosecutor argued that Ackerman came "sneaking up for no other reason that is fathomable except to gain a tactical advantage to take [Anthony] by surprise . . . with this weapon in his hand" and "try and kill" him.

Defense counsel argued, "This is a drug deal gone bad" and "Ackerman didn't intend to kill anyone." Counsel asserted that Ackerman entered the apartment unarmed, the knife belonged to Anthony, and Ackerman "had no choice but to act in self-defense."

ECF No. 8-1 at 3-7.

## II.   PROCEDURAL BACKGROUND

On November 8, 2017, a jury found Petitioner guilty of attempted voluntary manslaughter as a lesser included offense of attempted murder (Cal. Penal Code, §§ 664, 187, subd. (a); count

---

[3] This was elicited on cross-examination during the People's case. Also, by stipulation, Anthony was impeached with prior convictions for receiving stolen property, felony grand theft, and possessing a stolen vehicle.

1), criminal threats (Cal. Penal Code § 422; count 2), and assault with a deadly weapon (Cal. Penal Code § 245, subd. (a)(1); count 3). ECF No. 8-1 at 2; ECF No. 8-15 at 216-222. The jury also found that Petitioner used a knife and inflicted great bodily injury in the commission of the attempted voluntary manslaughter and assault with a deadly weapon, but did not find that Petitioner used a knife in making a criminal threat. Id. Outside the jury's presence, Petitioner admitted that he had sustained: (1) two probation denial priors (Cal. Penal Code § 1203, subd. (e)(4)); (2) a prison prior (Cal. Penal Code § 667.5, subd. (b)); (3) a serious felony prior (Cal. Penal Code §§ 667, subd. (a)(1), 668, 1192.7, subd. (c)); and (4) a strike prior (Cal. Penal Code §§ 667, subd. (b)-(i), 668, 1170.12). ECF No. 8-1 at 2; ECF No. 8-15 at 213-14. On December 15, 2017, the trial court sentenced Petitioner to an aggregate term of 20 years in prison, which included a five-year consecutive term for the serious felony prior. ECF No. 8-1 at 2; ECF No. 8-15 at 225-26.

On July 6, 2018, Petitioner appealed his conviction arguing that the trial court erroneously: (1) excluded impeachment evidence of a witness's drug use, (2) failed to give a unanimity instruction on count 2, and (3) imposed the upper term on count 1. See ECF Nos. 8-2 & 8-3. The California Court of Appeal reversed Petitioner's criminal threat conviction based on the trial court's failure to give a unanimity instruction to the jury and remanded the case to allow the trial court to consider whether to exercise its discretion under Penal Code section 1385 subdivisions (a) and (c) to strike the five-year prior serious felony conviction enhancement. ECF No. 8-1 at 19-32. On May 14, 2019, Petitioner filed a petition for review of his evidentiary error claim in the California Supreme Court. ECF No. 8-7. The court denied the petition on June 19, 2019 without comment or citation. ECF No. 8-8.

On remand, the trial court found it would not be in the furtherance of justice to strike the prior under section 1385 and reinstated the previously imposed twenty-year prison sentence. ECF No. 8-9 at 2. On January 31, 2020, Petitioner appealed the trial court's decision and the California Court of Appeal affirmed the judgment. See ECF Nos. 8-9 & 8-10.

On August 10, 2020, Petitioner filed the instant amended federal petition for writ of habeas corpus raising only the evidentiary error claim asserted during direct appeal. ECF No. 4.

## III. STANDARD OF REVIEW

Ackerman's Petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320 (1997). Pursuant to AEDPA, a state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless it: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Harrington v. Richter, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Rice v. Collins, 546 U.S. at 338-39, quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101, quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2245(d) stops short of imposing a complete bar on federal court relitigation of claims already

6

20cv1091-LAB(BLM)

rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Richter, 562 U.S. at 102.

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991); Richter, 562 U.S. at 99-100 (an unexplained denial of a claim by the California Supreme Court is an adjudication on the merits of the claim entitled to AEDPA deference unless "there is some reason to think some other explanation for the state court's decision is likely."). The California Court of Appeal's April 10, 2019 decision was the last reasoned state court decision that addressed Petitioner's claim and there is no reason to believe the Supreme Court's silent denial was based on a different explanation. Accordingly, in reviewing the habeas petition, this Court reviews that appellate court decision.

## IV. DISCUSSION

Petitioner contends that the trial court violated his constitutional rights to confront a witness, present a defense, and due process when it precluded the impeachment of prosecution witness Bianca Beltran ("Bianca") regarding her prior drug use and possession. Pet. at 6; Traverse at 2. Petitioner asserts that Bianca volunteered a "sweeping assertion" that she did not agree to sell drugs to Petitioner and that the impeachment evidence "was relevant and fundamental to the defense theory of self-defense and lack of premeditation and deliberation on the attempted murder charge" because it "tended to show that Bianca agreed to sell [Petitioner] drugs." Pet. at 6. Petitioner argues that this evidence was highly probative and would have demonstrated that his motivation to return to the apartment a second and third time was to obtain drugs, not to attack Anthony. Id.; Traverse at 2, 5.

Respondent argues that the California Court of Appeal reasonably rejected this claim because Petitioner was provided a constitutionally adequate opportunity to cross-examine Bianca. Answer at 9-10. Respondent asserts that the excluded impeachment evidence concerned a collateral matter and would not have changed the jury's view of Bianca's credibility

7

20cv1091-LAB(BLM)

in light of the other impeachment evidence that was admitted.  Answer at 9-10.  Respondent further asserts that any error in excluding the impeachment evidence was harmless.  <u>Id.</u> at 10.

### A. Court of Appeal Opinion

In its reasoned opinion, the Court of Appeal affirmed the decisions of the trial court and provided the following background:

> During cross-examination, Bianca answered defense counsel as follows:
>
> "Q: . . . Now, when you got Mr. Ackerman's phone number . . . before he left did you and Mr. Ackerman agree on anything?
>
> "A: No.
>
> "Q: Did you at any point agree to sell Mr. Ackerman drugs?
>
> "A: To do what?
>
> "Q: To sell Mr. Ackerman drugs?
>
> "A: I have no—I have nothing in—why would I sell any type of drugs to anybody? I don't even—
>
> "Q: *Well, isn't it true, [Bianca], that you at least at the time of the incident, you have used drugs before, right?*
>
> "A: *No, I have not.*
>
> "[Prosecutor]: *Objection. Relevance, Your Honor.*
>
> "The Court: *Overruled.*
>
> "Q: *It's your testimony—*
>
> "A: *I have not used drugs before. I have not.*
>
> "Q: *[Bianca], isn't it true that you currently from April 22, 2017 right before this—*
>
> "[Prosecutor]: Your Honor, could we go side-bar?
>
> "The Court: Yes." (Italics added.)
>
> At side bar, defense counsel stated she wanted to impeach Bianca with an

arrest for possessing a controlled substance. After the court reporter read back the testimony italicized above, the court stated, "She just answered that she didn't have an agreement. I thought that maybe she had volunteered 'I've never used drugs' so then I thought okay, then you can ask her questions, but she hasn't said that, and so I don't think it's appropriate to ask her." The court added, "You can't impeach her with it. It's not like she volunteered something that you can go after. You have broached the subject about whether she agreed to sell the defendant drugs. She said no. And now you're getting into whether she uses drugs. [¶] . . . That's not appropriate impeachment."

After further discussion between the court and counsel, the court again explained, "[T]here's no foundation to ask her about drug use. That's not a permissible area of impeachment. She has not volunteered that she does not use drugs, so right now you cannot ask that question." Defense counsel responded:

"I'm just saying I'm asking for an opportunity so she can be impeached. I know she's going to deny that she has any—any involvement with drugs whatsoever, and we know for a fact that that's not true. I understand that she has to say first[, ']I did not—[]I've never possessed them, never used them,' but I'm asking from—Your Honor to allow me to ask one question which is: [H]ave you used drugs prior to this incident? And if she says yes, then, of course, I can't keep going with impeachment, but if she says no, we know for a fact that that's not true, then I can impeach her."

The court denied this request stating, "That's not a permissible area of inquiry to impeach a witness, not with this record . . . ."

Later, during Ackerman's case-in-chief, the jury sent a pre-deliberation note to the court stating, "[W]hat was so urgent for [Ackerman] to want to speak with [Bianca]? (Motive)"

Based on this note, defense counsel asked the court to allow her to recall Bianca. Defense counsel stated she wanted to ask Bianca, "'Well, have you ever possessed or used drugs?' And if she says, 'Yes,' that's great, I can't bring up the . . . open [possession] case. If she says, 'No, I've never possessed or used drugs,' I get to impeach her, and if she's—if I ask her, 'Have you ever sold drugs or bought drugs,' and she says, 'No,' I can also impeach her with text messages that we have. There are text messages between her and another individual where she's buying drugs." Defense counsel argued that by prohibiting her from asking these questions, Ackerman was deprived from "being able to fully argue to the jury . . . there is no attempt to kill but this is simply for him to go get his drugs."

Denying this request, the court again ruled that "asking a witness have you ever possessed or used drugs is not a permissible line of questioning." Additionally, stating that the evidence was inadmissible under Evidence Code

section 352, the court explained:

> "[Y]ou say you need to ask her this question in order to somehow argue that this was a drug deal. There is no evidence of a drug deal between them, and trying to get in text messages with other people? *That is collateral under [Evidence Code] 352.* That would only confuse the jury and would take them down a road that has nothing to do with this case. She said she didn't sell him—did not have an agreement to sell him drugs. You got her to answer those questions, but getting into questions about whether she has ever possessed or used drugs, [is] not allowed. And I explained to the jurors CALCRIM [No.] 106 the following with regard to asking questions: 'Do not feel slighted or disappointed if your question is not asked. Your question may not be asked for a variety of reasons including the reason that the question may call for an answer that is inadmissible for legal reasons.'" (Italics added.)

ECF No. 8-1 at 3-10.

The appellate court concluded that the exclusion of the impeachment evidence did not violate Petitioner's state or federal constitutional rights. Id. at 16-19. Citing California Supreme Court law, the court recited that a defendant has a constitutional right to cross-examine adverse witnesses but that the right is not absolute. Id. at 16. The court stated that "[t]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." Id. The court noted that a trial court may properly limit cross-examination for a number of reasons including to limit prejudice, especially on collateral matters or matters with minimal probative value, confusion, or undue consumption of time. Id. at 16-17. The court concluded that the exclusion of the impeachment evidence was proper under California Evidence Code section 352 because the evidence had minimal relevance, was on a collateral issue, would consume undue amounts of time, and would confuse the jury. Id. The court also noted that the witness was substantially impeached with other evidence so it was unlikely a reasonable jury would have had a significantly different impression of the witness had the excluded cross-examination been permitted. Id. at 17-19.

///

B. Legal Standard

The Sixth Amendment provides that a criminal defendant has the right to confront the witnesses against him. U.S. Const. amend. VI; Crawford v. Washington, 541 U.S. 36, 61 (2004); Maryland v. Craig, 497 U.S. 836, 845–46 (1990) (explaining that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversar[ial] proceeding before the trier of fact"). The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Crawford, 541 U.S. at 61.

However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). While the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee a cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. See Delaware v. Fensterer, 474 U.S. 15, 20 (1985). A trial judge enjoys broad latitude to "exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury . . . so long as the rulings are not arbitrary or disproportionate." Menendez v. Terhune, 422 F.3d 1012, 1033 (9th Cir. 2005); see Montana v. Egelhoff, 518 U.S. 37, 42–43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion); see Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (holding that the Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant).

C. Analysis

The appellate court's decision that the exclusion of the drug use impeachment evidence did not violate Petitioner's constitutional rights was not contrary to, nor an unreasonable application of, clearly established federal law. First, although the appellate court did not cite

United States Supreme Court cases or other federal law, the court identified and applied the correct standard. The appellate court stated that it was considering whether there was a "federal constitutional violation" and described the correct legal standard as stated by the United States Supreme Court. ECF No. 8-1 at 16-17. A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. Id. Here, the appellate court identified and applied the correct standard.

Second, the appellate court correctly determined that Petitioner was provided a constitutionally adequate opportunity to cross-examine Bianca. Petitioner conducted a lengthy cross-examination of Bianca. ECF No. 8-13 at 233-252. During this cross-examination, Petitioner explored a number of topics, established Bianca's potential biases, undermined Bianca's credibility, and impeached Bianca with a prior inconsistent statement. Id. Petitioner established that Bianca had a much closer relationship with the victim, Anthony Kiryakoza, than she had with Petitioner. Id. at 237. After Bianca testified on direct examination that she and Anthony were "not really" in a relationship and they were just friends [ECF No. 8-13 at 218], Petitioner impeached her with a prior statement in which she indicated that her relationship with Anthony was romantic. Id. at 234-237; 913-915 (testimony of the defense investigator who obtained the prior statement). Petitioner elicited contradictory testimony from Bianca regarding what happened when Petitioner returned to the apartment the second time. Id. at 244-46. Bianca testified that she didn't know why Petitioner returned and had not reached an agreement with him but admitted that he probably came to see her, that he called and texted her when he was at the house, and that as soon as he left, she texted him "I'm sorry, I'm so fucking sorry." Id. Petitioner also elicited testimony that Bianca observed the violent altercation and yet left the scene without waiting for, or talking to, the police. Id. at 250-52. Bianca did not go to the hospital with Anthony; she just called a friend for a ride and left before the police arrived. Id. Petitioner's counsel used the information obtained during Bianca's cross-examination to argue during her closing argument that Bianca was biased against Petitoner and lacked of credibility:

> [Bianca's] credibility. Okay. You may be asking, where is [the defense] getting all this drug-related stuff? Okay. . . . She lied about her relationship with [Anthony]. Clearly they had talked before this. I mean they're dating. They're friends. You heard my investigator come up. I was there, the investigator was there. She asked her were you in a relationship with him. She was. She's—they're not telling the truth, and you ask why? Why are you not being truthful about that? Who cares if they're in a relationship? They want to avoid bias. Is that what it is?
>
> But more importantly why is she avoiding the police? There was over fifteen officers on scene. . . . She left before the cops arrived. . . . Why is she avoiding the police. . . . [¶] . . .
>
> Why would a person who is so innocent and didn't do anything wrong whose boyfriend or friend, whatever you want to call it, just got stabbed almost to death would you not want to explain to the cops what happened? Could it be that you have drugs on you? Could it be that you have a guilty conscious [*sic*] because you had made an agreement with Mr. Ackerman to exchange for drugs? Maybe she's under the influence. I don't know. But there's something she's hiding. There is a reason why she's staying away from every single officer. She's the only witness that saw what happened but yet she didn't give one single statement. . . . She's hiding something. She's involved with this. She was selling drugs to Mr. Ackerman, but she didn't want to get caught and get in trouble. That's what this is about.
>
> And not to mention we know she has a guilty conscious [*sic*], she texted, 'I'm so sorry.' That's evidence. That's not even contested. She texted him. Why would you text, oh, I'm so sorry. . . . The only reason she's texting him sorry is because she has a guilty conscious [*sic*]. She knows. She was involved with this. She knows. She could have came [*sic*] out the second time and given him the drugs that they agreed on. That's what this is about, but she can't go against [Anthony].

Id. at 1037-39. As such, the record contains ample evidence that Petitioner had a constitutionally adequate opportunity to cross-examine Bianca.

Third, the appellate court correctly determined that the trial judge provided constitutionally permissible reasons for excluding the impeachment testimony. The trial transcript reveals that immediately after Bianca indicated she had not agreed to sell drugs to Petitioner on the day of the attack, Petitioner's attorney tried to impeach her with prior drug use. ECF No. 8-13 at 238. The trial judge determined that prior drug use was not a permissible topic of impeachment because there was no foundation for the evidence, Bianca denied engaging in or setting up a drug sale and did not volunteer that she never used drugs, and drug

use is not a crime of moral turpitude. Id. at 240-43. In response to Petitioner's request to reconsider after a jury note, the trial court relied on Evidence Code section 352 and stated "[t]here is no evidence of a drug deal between" Bianca and Petitioner, and defense counsel's attempt to question Bianca regarding her drug use or possession "would confuse the jury and would take them down a road that has nothing to do with this case." Id. at 961.

The appellate court found that all of these reasons were within the scope of the trial judge's discretion and valid reasons to exclude the evidence. ECF No. 8-1 at 11-15. The stated reasons also are constitutionally valid reasons for excluding the drug use impeachment testimony. Id. at 16-19; see also, Egelhoff, 518 U.S. at 42-43 (due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion); Van Arsdall, 475 U.S. at 679 (Confrontation Clause does not prevent a trial judge from limiting cross-examination based on concerns of prejudice or confusion of issues). Whether Bianca used drugs on a prior occasion has minimal, if any, relevance to whether Bianca agreed to sell drugs to Petitioner and therefore minimal relevance to Petitioner's defense that he was at the apartment to buy drugs from Bianca and not to harm Anthony. The drug use impeachment evidence also was minimally relevant given Petitioner's behavior during the third visit, including using a ladder to access the second floor patio and then immediately assaulting the victim. In summary, the desired drug use impeachment testimony was unduly prejudicial, addressed a collateral matter, and could lead to jury confusion and undue delay, especially since Bianca had not been convicted of a drug possession crime (see ECF No. 8-13 at 959-960).

For all of these reasons, the appellate court's decision that the exclusion of the drug use impeachment evidence did not violate the federal constitution is not contrary to, nor an unreasonable application of, clearly established federal law. See, Bates v. Soto, No. 15-3326, 2015 WL 9451089, at *9 (C.D. Cal. Nov. 16, 2015) (finding no constitutional violation where California Court of Appeal found the trial court's decision to exclude impeachment evidence of simple drug possession was within its broad discretion because possession is not a crime of moral turpitude and petitioner had not established relevance), affirmed by 2015 WL 9455554

(C.D. Cal. Dec. 22, 2015).

### D. Harmless Error

Petitioner contends that there was a reasonable chance that he would have "received a more favorable verdict . . . had the trial court not erred by excluding impeaching evidence of [Bianca's] prior misconduct of her recent arrest for drug possession and or her cell phone text messages trying to buy drugs." Traverse at 6. Petitioner argues that the impeachment evidence would have demonstrated his motivation to return to the apartment to buy drugs and that he had to act in self-defense, rather than out of revenge, when confronted by Anthony. Id. at 7. Respondent asserts that if there was an error, the error was harmless because even if Bianca had agreed to sell drugs to Petitioner, that agreement would not have undermined the substantial evidence that Petitioner returned to the apartment a third time, used a ladder to sneak up the outside of the building, surprised the victim in the apartment, and then stabbed him multiple times. Answer at 16-17.

"[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." Van Arsdall, 475 U.S. at 684; Moses v. Payne, 555 F.3d 742, 755 (9th Cir. 2009); see also Winzer v. Hall, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to harmless-error analysis . . . because its effect can be quantitatively assessed in the context of other evidence presented to the jury.") (citations and internal quotation marks omitted). In evaluating the error, a court should consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684. A petitioner is not entitled to habeas relief unless he can establish that the trial court's error "had a substantial and injurious effect or influence in determining the jury's verdict." Moses v. Payne, 555 F.3d 742, 755 (9th Cir. 2009) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); see also Fry v. Pliler, 551 U.S. 112, 121 (2007) ("in § 2254 proceeding a court must assess the prejudicial impact of constitutional

error" under the Brecht standard).

Petitioner has not met his burden. Initially, as set forth above, the trial court did not commit a constitutional violation when it excluded the drug use impeachment testimony. Even if the exclusion of the drug use testimony was a mistake, the error was harmless. First, the excluded drug use evidence was minimally relevant to Petitioner's defense since Bianca had not been convicted of any drug use crime and Bianca's past drug use has little relevance to Petitioner's allegation that he was at the apartment that day to buy drugs from Bianca and to the facts establishing the crimes Petitioner was convicted of. Second, Petitioner had ample opportunity to cross-examine Bianca on other issues and undermined her credibility in a number of significant ways. Third, there was substantial evidence supporting the jury's verdict, including that the Petitioner visited the location three times on the day of the attack; during the first and second visits, Petitioner parked in the liquor store's parking lot but during the third visit, when Petitioner attacked the victim, Petitioner parked down the street and out of sight of the liquor store and apartment; during the second visit, the victim and the Petitioner exchanged heated words, the victim told Petitioner to leave, and Petitioner angrily responded, "I know where you live. I'll be back."; Petitioner returned the third time with a ladder, which he did not have during the first and second visits and which he used to access the second floor of the building; and Petitioner climbed up the ladder onto the second floor patio, barged into the apartment where the victim was working, and immediately attacked the victim. See, ECF No. 8-1 at 3-5; ECF No. 8-13 at 276-82, Testimony of Randi Allen; ECF No. 8-13 at 399-404, Testimony of Stephen Gentile. Even if Bianca had agreed to sell drugs to Petitioner, that agreement would not have justified or explained Petitioner's conduct during the third visit or undermined the strong evidence that Petitioner snuck up on the victim and attacked him. Accordingly, Petitioner has not established that the error, if in fact it was an error, had a substantial and injurious effect in determining the jury's verdict.

For the reasons set forth above, the Court finds that the appellate court's decision that the exclusion of drug use evidence did not violate the federal constitution was not contrary to, and did not involve an unreasonable application of, clearly established Federal law. The Court

further finds that if the exclusion of the evidence was an error, the error was harmless. Accordingly, the Court **RECOMMENDS** that Petitioner's habeas petition be **DENIED**.

## V. CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **April 30, 2021**, any party to this action may file written objections with this Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 21, 2021**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated: 4/2/2021

Hon. Barbara L. Major
United States Magistrate Judge

17
20cv1091-LAB(BLM)